UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEE WALTER MITCHELL,<br><br>                    Petitioner,<br><br>            v.<br><br>CHRISTIAN PFEIFFER,<br><br>                    Respondent. | Case No.  1:18-cv-01645-AWI-JDP<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR A WRIT OF HABEAS CORPUS AND TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY<br><br>OBJECTIONS DUE WITHIN 30 DAYS<br><br>ECF No. 1 |

Petitioner Dee Walter Mitchell, a state prisoner without counsel, petitions for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 1. He claims that: (1) his due process rights were violated when the trial court admitted unreliable and coerced witness testimony, and (2) his Sixth Amendment right to counsel was violated because his attorney did not move to exclude the same testimony.[1] *Id*. at 7. The California Court of Appeal rejected his claims on the merits in a

---

[1] In his reply, petitioner also claims that the trial court erred in denying his motion for a new trial. ECF No. 25. Although petitioner exhausted this claim at the state level, he did not raise it in his federal petition. A "party may not make new arguments in the reply brief." *United States v. Cox*, 7 F.3d 1458, 1463 (9th Cir. 1993). Because this claim was not properly presented, the undersigned declines to rule on it. Even if the claim had been properly presented, however, it would not warrant relief. The Court of Appeal relied on California law in affirming the trial court's denial of petitioner's motion for a new trial, finding that the "trial court was well within its discretion in finding that no juror would have changed his or her vote to not guilty given the evidence presented." *See People v. Mitchell*, No. F071954, 2017 Cal. App. Unpub. LEXIS 5308, at *24 (Aug. 2, 2017). Because the Court of Appeal's decision was based on state law, this court is bound by that decision on federal habeas review. *See Bradshaw v. Richey*, 546 U.S. 74, 76

reasoned decision, *see People v. Mitchell*, No. F067246, 2014 Cal. App. Unpub. LEXIS 9154, at *3-13 (Dec. 23, 2014), and the California Supreme Court summarily denied review, *see People v. Mitchell*, No. S224028, 2015 Cal. LEXIS 1392, at *1 (Mar. 11, 2015). *Id*. at 53.[2] For the reasons set forth below, the undersigned recommends that the court deny the petition.

## I. Background

In 2012, a jury sitting in Stanislaus County convicted petitioner of first-degree murder and attempted robbery, with firearm and special circumstance enhancements. *Id*. at 52. The court sets forth below the pertinent facts of the underlying offenses, as summarized by the California Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

> **Ham's Shooting**
>
> On October 8, 2011, at approximately 4:00 pm, Ham was selling ice cream from a cart attached to his bicycle. He was shot and killed after two African-American males attacked him. Ham died from a single gunshot to the lower portion of his left chest. The bullet then exited his body, but was not recovered. However, a .380-caliber shell casing was found at the scene of the shooting.
>
> **Three witnesses saw the attack**
>
> Anthony Morrell-Pardee heard a "popping" noise and saw two African-American males and Ham running around in the street. He looked the other way after deciding that they were "messing around" but then he heard another "pop" and looked again. He saw one of the African-American males, who was short and slender, pointing a gun while the other bigger male chased Ham. The gunman appeared to aim the gun at Ham, and then Morrell-Pardee

---

(2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

[2] At the end of trial, petitioner moved for a new trial based on a claim of newly discovered evidence. ECF No. 1 at 52. The trial court denied the motion. On direct appeal, petitioner raised the same two claims appearing in the instant petition and also claimed that the trial court erred in denying his motion for a new trial. *Id*. at 53. The Court of Appeal, in a reasoned decision, affirmed the denial of the two claims that petitioner now raises, but remanded for another hearing on petitioner's motion for a new trial. *Id*. On remand, the trial court again denied petitioner's motion for a new trial; petitioner directly appealed. The appellate court affirmed, *see Mitchell*, No. F071954, 2017 Cal. App. Unpub. LEXIS 5308, at *26, and the California Supreme Court summarily denied review, *see People v. Mitchell*, No. S244260, 2017 Cal. LEXIS 8262, at *1 (Oct. 18, 2017).

heard another pop and saw some smoke. The shooter then turned around and jogged slowly into a nearby alley while the bigger male continued to attack Ham, punching and grabbing at him. Ham tried to get on his bicycle, but the bigger male grabbed the handlebar and started hitting Ham in the side of his face repeatedly. The larger male then ran into the same alley as the shorter man, while Ham was grabbing or patting his chest or abdomen and asking for help. In court, Morrell-Pardee did not identify Mitchell as the shooter and he explained that he only saw a profile of the shooter's face.

Armando Mendoza heard a gunshot and then heard someone say either, "Finish him" or "Kill him" or "Shoot him." He then heard a second gunshot and saw two African-American males running towards the alley. Mendoza could not describe the two men he saw running. He never identified Mitchell as the shooter.

Theresa Kirkland saw two men "tussling with the ice cream man." The shorter of the two men was ripping at Ham's pockets, while the taller of the two men pulled on Ham's arm. The two men then ran across the street, stood there, and then the shorter male told the taller male to shoot Ham. The taller male pulled a gun out of his right pocket and shot it two or three times, hitting Ham. The taller male then passed the gun to the shorter male, who shot the gun one time. Ham then fell to the ground.

Kirkland testified that Mitchell was not one of the males that she saw involved in Ham's shooting.

**Police are led to Mitchell and Whitfield**

A.S., who was in the eighth grade when he testified, resided in the neighborhood where Ham was shot. On the night of the shooting, A.S. saw two males standing on the front porch of his neighbor's house. He knew that his neighbors were not home, which caused him to notice the two males. He saw the two males walk away at a fast pace, and they kept looking back over their shoulders. A.S. went inside and told his aunt, who notified law enforcement.

Police responded to A.S.'s location to talk to him. A.S. told the police that he thought he recognized one of the two males as a "Chris" who had been "hanging out" at a house on the corner of Martin Luther King and Maple Street. Police then drove A.S. to that location as a "driveby" and they saw a group of subjects standing on a driveway, which was later identified as 200 Martin Luther King Drive, Unit A. This was Mitchell's residence.

Police officers staked out a perimeter at Mitchell's residence. Sometime that same night, detectives went to the front door and knocked. At or around the same time, an officer positioned in the back of Mitchell's residence heard a bang, like a heavy object hitting a wooden fence. Police discovered a .380-caliber handgun along the fence of Mitchell's residence with the magazine still in it containing four unfired rounds. At trial, however, a police firearms expert was unable to say whether or not

3

the .380-caliber casing found at the shooting scene had been fired from this particular weapon.

Police made contact with Mitchell at the front door of his residence. They spoke with Mitchell outside his residence for approximately 30 minutes before he allowed them to enter. Police found Whitfield in the back of the house approximately 40 minutes after they first knocked on the front door. Police took both Mitchell and Whitfield into custody that night.

Later that same night, police drove A.S. back to 200 Martin Luther King Drive, Unit A, to identify Whitfield and Mitchell. It was dark when the viewing occurred and A.S. remained in the police vehicle. The police shone the vehicle's lights on the first individual, whom A.S. recognized by his hair as the "bigger" of the two males he saw earlier that day. A.S., could "not really" identify the second male that he was shown because he did not see his face. A.S., however, after seeing the second male told police, "Yeah, that's him." A.S. identified the second male because his skin tone was lighter than the other male's skin tone.

In court, A.S. could not identify Mitchell as being one of the males he saw on October 8, 2011.

**Forensic Evidence**

There were no latent fingerprints on the recovered handgun and no gunshot residue was detected on either Mitchell or Whitfield. Mitchell's DNA, however, was discovered on the recovered gun as a "major contributor" while Whitfield's DNA was not identified on the gun. One impression had the same general pattern and size as the size 14 Creative Recreation shoes which Whitfield wore that day, but the findings were inconclusive. Another impression was "most likely" made by the red Vans shoes later found in Mitchell's house, which Whitfield saw Mitchell wear during the shooting and which Mitchell admitted to police were his. However, it was not "absolutely positive" that Mitchell's shoes caused the impression.

During a search of Mitchell's residence, police located and seized several cellular telephones. Police identified one of the phones as belonging to Mitchell and subpoenaed Mitchell's cell phone records. The records contained text messages from Mitchell's cell phone.

Two days before Ham's shooting Mitchell texted multiple people looking to purchase a gun. The day before the shooting Mitchell texted Manuel Retana asking for a gun and indicated he could pay $300. Later that same day, Retana texted Mitchell that he had a gun for him and Mitchell sent his uncle to pick it up. Retana texted Mitchell later that same day indicating that he gave the gun to Mitchell's uncle, texting "Thr u go, man. B easy, G."

On the day before Ham's shooting, Mitchell texted a "Markus L." indicating that he needed the clip from his old gun and he had the same kind, a ".380" caliber gun. On the morning of Ham's

4

shooting, Mitchell texted a "Mando" asking for .380 bullets and that he needed them "ASAP." Mitchell also texted "Markus" early in the morning on the day of the shooting and indicated he was trying to hit a "lick"—which is street slang for a robbery.

Cell phone towers placed Mitchell's cell phone in the general area of the shooting at the time Ham was shot.

**Whitfield's Trial Testimony**

Detectives interviewed Whitfield early in the morning after the shooting, starting at 2:20 a.m. Two days after the first interview, detectives interviewed Whitfield a second time.

Before trial, in May 2012, Whitfield signed a plea agreement with the prosecution to testify against Mitchell in exchange for a guilty plea and a sentence of 13 years and 8 months in prison.

At trial, Whitfield told the jury that he and Mitchell walked to West Side Market in the afternoon on the day of the shooting. On the way back from the market they saw Ham. Mitchell told Whitfield to hurry and catch Ham, but Ham turned around and came back. Mitchell then told Ham to empty his pockets. Ham began to curse at them, and he sounded drunk. Whitfield stated he had often seen Ham drunk before.

Ham dismounted his bicycle and was about five feet away from Whitfield, and Mitchell was about the same distance away but to the side and on Whitfield's right. Whitfield punched Ham because Ham cursed at him.

Whitfield heard a gunshot, reacted by looking around, and he saw a gun in Mitchell's hand. Mitchell held a black gun up with an extended, straight arm at shoulder level. Whitfield identified the gun in court (People's exhibit 58) as being the gun that Mitchell held in his hand.

After the gunshot, Ham "backed up and moved his cart." The first shot missed Ham, but the gun then went off again and Whitfield heard Ham scream. Mitchell ran down an alleyway and Whitfield followed. They ran through a yard and several streets until they came to Whitfield's house, where Whitfield changed his pants and shoes. Mitchell then left Whitfield's house and Whitfield stayed behind talking on the telephone with his cousin for 30 or 40 minutes. Whitfield met Mitchell later that day near the crime scene and they saw police lights and yellow tape. Whitfield went back to his house for 10 to 15 minutes while Mitchell waited for him near the crime scene. The two then went back to Mitchell's house where Mitchell changed his clothes.

While they were both at Mitchell's house the police arrived and knocked on the front door. After hearing the police, Whitfield walked to the back of the house to the only bedroom. Mitchell was already in that back bedroom. Whitfield watched as Mitchell

5

> opened the bedroom window, tore open the screen, and threw a gun out the window.
>
> After throwing the gun out the window, Mitchell then walked out of the bedroom. Whitfield stayed behind and he did not hear any of the conversation with the police. Whitfield remained in the bedroom for about 20 minutes or longer before he left and encountered the police.
>
> Later that night, the police interviewed Whitfield at the police station. He testified that he was not truthful during that first interview when he had initially denied seeing anything about Ham's shooting. Whitfield then had a second interview with police a couple days later at juvenile hall. He testified that he was more truthful during his second interview. Whitfield said that he never discussed a plea agreement with the police during either of these two interviews.
>
> Whitfield testified he touched Mitchell's black gun a couple of days before the shooting after Mitchell gave it to him to hold. He denied knowing Mitchell was carrying a gun when he and Mitchell walked to the market before encountering Ham. He also denied that Mitchell talked to him about his plans.
>
> Whitfield recalled that Mitchell wore red Vans with white soles and white shoelaces on the day of the shooting, but on cross-examination he could not describe any other article of clothing that Mitchell wore that day.
>
> On cross-examination, Whitfield agreed he had to tell the jury the same thing he told the officers in order to comply with the plea agreement. In addition to the guarantee of a reduced sentence, Whitfield testified he received some special favors on the day he signed the agreement—he was able to eat fast food and the police attempted to arrange a special visit for him with his family.
>
> Whitfield denied chasing Ham or wrestling with him before the shooting.
>
> On rebuttal, Whitfield reiterated he was telling the truth and not just repeating what he told the police in order to get the plea deal. Whitfield agreed that, from the very beginning, he said his fingerprints would not be on the gun, that he did not hold the gun when Ham was shot, and he did not throw the gun out of the window. Whitfield denied that he told the officers "what they wanted to hear" just so he could go home.

*Mitchell*, No. F067246, 2014 Cal. App. Unpub. LEXIS 9154, at *3-13; ECF No. 1 at 51-88.

6

## II. Discussion

### A. Standard of Review

A federal court can grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000).[3] Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the last state court to have issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). In general, § 2254 requires deference to the state-court system that determined the petitioner's conviction and sentence.

Under AEDPA, a petitioner can obtain relief on federal habeas claims that have been "adjudicated on the merits in state court proceedings" only if he shows that the state court's adjudication resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The petitioner's burden is great. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("[To gain relief under § 2254(d)(1), the petitioner] must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"); *see Davis v. Ayala*, 576 U.S. 257, 271 (2015) (quoting § 2254(e)(1)) ("[Under § 2254(d)(2), s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'").

If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish

---

[3] This court has jurisdiction over the petition pursuant to 28 U.S.C. § 2241(a): "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."

some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id*. at 103 (citation omitted).  This court's habeas review authority serves as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 102-103 (emphasis added).

This court reviews the last reasoned decision—in this case, that of the Court of Appeal. Because the Court of Appeal rejected both of petitioner's claims on the merits, the deferential standard of § 2254 applies.

**B.     Claims of Unreliable and Coerced Testimony**

Petitioner claims that the admission of Whitfield's testimony violated his due process rights because that testimony was coerced.  ECF No. 1 at 23.  Specifically, he claims that Whitfield, who had entered into an agreement with the prosecution to testify, believed that he had to testify at trial in accordance with statements that he had made to police officers on prior occasions—when, in petitioner's view, Whitfield had been coerced to say that petitioner was the shooter.[4] *Id*. at 25.  The Court of Appeal rejected these arguments, finding that Whitfield was not "coerced to testify in a particular fashion" and that his agreement with the government only required him to tell the truth. *Id.* at 68.

Petitioner's habeas claim cannot succeed because he has not identified a "clearly established Federal law" supporting his claim. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (explaining that the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," as used in 28 U.S.C. § 2254(d)(1), "refers to the holdings" of Supreme Court decisions).  Although the Supreme Court has recognized that a defendant's due process rights are violated when the prosecution "knowingly use[s] false testimony which was

---

[4] Police officers placed petitioner and Whitfield in separate cells, subjecting at least Whitfield—who was fifteen years old at the time—to a prisoner's dilemma by telling him that if he did not implicate petitioner, petitioner would likely implicate him. During his first police interview, Whitfield denied seeing petitioner shoot Ham and stated that he had not seen petitioner throw a gun out the window. ECF No. 1 at 19. However, in a second interview a few days later, Whitfield stated that petitioner had shot Ham and thrown the gun out the window. *Id*. Whitfield then entered into a "testimony agreement" with the prosecution, in which he agreed to testify for the prosecution in exchange for "a sentence of 13 years and 8 months in prison." *Id*. at 19-20; *see* ECF No. 16-6 at 47-48.

8

extorted from a witness by violence and torture," *Hysler v. State of Florida*, 315 U.S. 411, 413 (1942), petitioner has presented neither evidence that the prosecution knowingly introduced false testimony nor evidence that Whitfield's testimony was obtained through violence or torture. And although a criminal defendant has a constitutional right to be protected from the admission of *his own* coerced testimony at trial, *see Jackson v. Denno*, 378 U.S. 368, 385-86 (1964), the Supreme Court has not extended this protection to the introduction at trial of coerced testimony of a third-party witness. *See Valine v. Muniz*, No. 2:16-cv-01027-JKS, 2017 U.S. Dist. LEXIS 109113, at *6 (E.D. Cal. July 13, 2017) (finding that Ninth Circuit precedent supporting a claim of alleged witness coercion is insufficient to warrant federal habeas relief in the absence of a clearly established Supreme Court law supporting such a claim); *Trammell v. Ducart*, No. 1:14-cv-00954-AWI-MJS, 2015 U.S. Dist. LEXIS 96334, at *10 (E.D. Cal. July 23, 2015) (finding that federal habeas relief for coerced witness statement was unavailable under AEDPA standard of review); *Samuel v. Frank*, 525 F.3d 566, 569 (7th Cir. 2008) (noting that the United States Supreme Court "has not decided whether the admission of a coerced third-party statement is unconstitutional").

Just as critically, petitioner has failed to show that the Court of Appeal made an unreasonable determination of facts when it found that Whitfield's testimony was not coerced or unreliable. Testimony obtained through an agreement to testify against a co-defendant in exchange for a more lenient sentence is not necessarily inadmissible. The pressure resulting from such an agreement generally is "not the kind of coercion that leads to objectionable, involuntary confessions." *United States v. Moody*, 778 F.2d 1380, 1384-85 (9th Cir. 1985). The existence of the agreement "casts doubt on the witness' statements that tend to show a defendant's guilt—doubt which defense counsel can develop on cross-examination." *Id.*; *see Randolph v. California*, 380 F.3d 1133, 1148 (9th Cir. 2004) (rejecting an argument that the testimony of witnesses who received favorable plea bargains violated due process and should have been excluded as inherently unreliable when cross-examination revealed plea bargains and witness' incentive for testifying); *Darden v. United States*, 405 F.2d 1054, 1056 (9th Cir. 1969) (noting that a plea bargain "affects only the weight of the testimony, not its admissibility").

Here, petitioner has presented no evidence of anything inherently coercive about his agreement to testify, *see Moody*, 778 F.2d at 1384, and the language of that agreement coupled with the evidence presented at trial casts doubt on petitioner's claim that Whitfield's testimony was unreliable. Whitfield's agreement required him to affirm that he made earlier statements to police officers, but it did not require him to testify in accordance with those statements.[5] ECF No. 1 at 67. Rather, the plain language of the agreement required him to testify truthfully at trial.[6] Whitfield also repeatedly testified to the truthfulness of the statements that he made during his second interview. The jury understood that Whitfield had changed his story during police interrogation and that he had entered into an agreement with the prosecution regarding his trial testimony.[7] ECF No. 16-6 at 47-48. Whitfield was subject to cross-examination. *See Randolph*, 380 F.3d at 1148; *Williams v. Woodford,* 384 F.3d 567, 596 (9th Cir. 2004) (citing *United States v. Mattison,* 437 F.2d 84, 85 (9th Cir. 1970)) (noting that there is no violation of due process when a witness who previously was illegally interrogated is "subject to cross-examination at trial through which the jury could assess the witness's credibility"). It was the job of the jury to assess the credibility of Whitfield's testimony considering his previous statements and his agreement to testify. *See Jackson v. Denno*, 378 U.S. 368, 386 (1964) ("[Q]uestions of credibility, whether of a witness or a confession, are for the jury."). Accordingly, the undersigned recommends that petitioner's claim be denied.

---

[5] The record does not support petitioner's contention that Whitfield believed that he had to testify at trial that petitioner was the shooter in order to receive the benefit of the testimony agreement. Although Whitfield testified on cross-examination that he had to "tell us the same thing you told the officer back in April," ECF No. 16-6 at 102 (petitioner was interviewed a third time the following April; he affirmed the accuracy of his statements in his second interview), Whitfield repeatedly testified that his statements during his first police interview were false and that his statements during his second interview and at trial were true, *id.* at 47; 91; 124-37; 146. Whitfield also testified that he told "some lies" during his first police interview, *id.* at 83; 102-104, and that during his second interview he did not just tell the officers what they wanted to hear so that he could go home, *id.* at 142.

[6] The agreement stated that Whitfield was required to "testify completely, accurately, and truthfully at all hearings and trials regarding these crimes, including affirmation of prior statements." ECF No. 1 at 67.

[7] The video recording, written transcripts of the first interview, and a copy of the testimony agreement were presented to the jury. ECF No. 1 at 35; 39.

### C. Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective because he failed to object to the admission of Whitfield's testimony. ECF No. 1 at 45. The Court of Appeal rejected petitioner's claim, finding that because Whitfield's trial testimony was properly admitted under California law, petitioner failed to demonstrate any prejudice from his counsel's alleged error. *Id*. at 74.

The two-step inquiry from *Strickland v. Washington* guides this court's analysis of an ineffective-assistance-of-counsel claim on habeas review. *See* 466 U.S. 668, 687 (1984). Under *Strickland*, a criminal defendant must first show some deficiency in performance by counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id.* Second, the defendant must show that the deficient performance caused him prejudice. *Id*. This requires petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, *see Andrus v. Texas*, ___ U.S. ___, 2020 WL 3146872, at *8 (June 15, 2020) (per curiam). Under *Strickland*'s first prong, this court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689. Counsel is not obligated to take futile actions. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (explaining that the merits of the underlying claim "control the resolution of the *Strickland* claim because trial counsel cannot have been ineffective for failing to raise a meritless objection"). Here, the court is bound by the Court of Appeal's finding that Whitfield's testimony was properly admitted under state law. *See Bradshaw*, 546 U.S. at 76 (noting that a "state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). This court cannot find that counsel's performance fell below the *Strickland* standard for failure to raise a meritless objection.

Separately, under *Strickland*'s second prong, petitioner has failed to show that he suffered prejudice from counsel's failure to object, meaning he has failed to show that the "result of the proceeding would have been different" but for his counsel's performance. 466 U.S. at 694. Petitioner gives the court no reason to think that an objection to Whitfield's testimony would have been sustained. And even if petitioner's counsel erred in failing to object, petitioner has given the

11

court no reason to think that the admission of Whitfield's testimony affected the reliability of the trial. *See id.* at 696. Accordingly, the Court of Appeal's rejection of petitioner's claim was not unreasonable, and the undersigned recommends that the petition be denied.

### III.    Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, petitioner has not made a substantial showing of the denial of a constitutional right. Thus, the undersigned recommends that the court not issue a certificate of appealability.

### IV.    Findings and Recommendations

The undersigned recommends that the court deny the petition for a writ of habeas corpus, ECF No. 1, and decline to issue a certificate of appealability. These findings and recommendations are submitted to the U.S. District Court judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties. That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated: __July 24, 2020__           _____
                                    UNITED STATES MAGISTRATE JUDGE

No. 206.